FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

# IN THE UNITED STATES DISTRICT COURT

'06 JAN 24 PM 12: 13

# FOR THE SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

UNITED STATES OF AMERICA,    )
                             )
            Plaintiff,       )
                             )
v.                           )        Case No. CR405-59
                             )
MARTIN BRADLEY, JR., et al., )
                             )
            Defendants.      )

## REPORT AND RECOMMENDATION

Defendant Martin Bradley, Jr. has filed a motion to determine his mental competency to stand trial. Docs. 277, 288. The parties have stipulated that the Court may  adjudicate the issue of defendant's competency on the basis of the expert reports filed with the Court, without holding a hearing or receiving any further argument or documentation.[1] Doc. 341. For the reasons that follow, the Court recommends that defendant be determined competent to stand trial.

---

[1]In the stipulation, the parties reference three neuropsychological evaluation reports by Dr. Tora L. Brawley, "dated 5/17/05, 7/25/05, and 11/7/05." The Court, however, was only furnished with two reports from Dr. Brawley. A different report from Dr. David Griesemer bears the date of 7/25/05, and the Court presumes that this is the report referred to in the stipulation as the 7/25/05 report of Dr. Brawley.

## I.   BACKGROUND

Defendant was indicted on March 22, 2005 in a RICO case charging a complex prescription drug-based fraud scheme.  Not until November 29, 2005, did defendant file a motion contesting his competency.  Defendant submitted his own psychiatric evaluations with the Court on three occasions:   in his Supplement to an Amended Motion to Sever, filed November 18, 2005; in his Motion for Hearing to Determine Competency, filed on November 29, 2005; and in his Supplemental Exhibits in Support of a Motion to Determine Competency, filed on January 11, 2006.  On December 5, 2005, the Court ordered that defendant be examined at the Federal Medical Center in Butner, North Carolina pursuant to 18 U.S.C. § 4241.  Defendant underwent an evaluation by a team of examiners at that facility from December 6, 2005 to December 23, 2005.

All the reports submitted to the Court discuss defendant's health history, noting that in his fifties he began having severe chronic back pain, associated with a car accident during his youth.  As treatment, defendant began taking narcotic analgesic medications, including Percodan,

2

Oxycontin, and Valium.  He continued to take these medications regularly until starting to scale back around mid-October, 2005.

Defendant apparently first evidenced concern about his memory on September 29, 2004 with his primary doctor, Dr. John Demicco.[2]  Dr. Demicco noted that defendant was concerned that perhaps he was "not as sharp as he used to be." Dr. Demicco informed his patient that "a lot of this may be the Oxycontin, the Valium, and the Remeron."

During an office visit on January 7, 2005, Dr. Demicco noted that defendant's chief complaints were "memory loss, low back pain, and anxiety/depression syndrome."  Defendant cited episodes of forgetfulness at that time, and he also noted that he was under a "tremendous amount of family stress." Dr. Demicco noted, however, that he was "not developing like someone who is developing dementia in that his remote memory is lost[;] . . . here in the office, he is sharp as a tack and his mental status examination is entirely normal."  Again, Dr. Demicco suggested that defendant was simply "under a lot of stress and may be clouded over the build up of time over these medications."

_____

[2]Dr. Demicco has been defendant's primary doctor for the past nine years. Medical records from this time were considered by all experts.

On May 17, 2005, defendant was referred to Tora L. Brawley, Ph.D., for a neuropsychological evaluation.[3]  Dr. Brawley's report notes that defendant was "significantly tangential" in his responses to questions and often had to be redirected to the original question.  She subjected defendant to a battery of tests.  He scored a Full Scale IQ of 103, indicating that he is in the average range of intellectual functioning. His attention and concentration were also found to be within normal ranges.  She found limitations in his motor speed and dexterity and noted both normal and severely impaired performance on various memory tasks.  Dr. Brawley concluded that the current results were "suggestive of a diagnosis of dementia," and she recommended further neurological and psychiatric evaluations for defendant in light of the results.

On July 22, 2005, defendant was seen by David A. Griesemer, M.D., for a neurological consultation.[4]  Dr. Griesemer wrote that defendant said there were "no times in the past month when he felt cheerful or happy, or that things would turn out well."  Defendant also spoke of crying spells and

[3]Dr. Brawley is a member of the Department of Neuropsychiatry and Behavioral Science at the University of South Carolina School of Medicine.

[4]Dr. Griesemer is a Professor of Neuroscience at the Medical University of South Carolina.

complained of racing thoughts, restless nights, and dizziness.    Dr. Griesemer noted that defendant was "attentive to conversation" and that he "immediately and effortlessly understood questions."  Dr. Greisemer described defendant as "moderately verbose" and noted some difficulty in interrupting his speech to refocus the discussion.  He describes defendant's responses to questions as "very quick, but rarely careless."

Dr. Griesemer  put defendant through several rounds of testing.  He ultimately found that defendant was depressed, stressed, and anxious.  He also diagnosed defendant with primary depression and anxiety; dementia; chronic tobacco, benzodiazepine and narcotic use; sleep disorder; possible vertebrobasilar insufficiency; and mild peripheral neuropathy with loss of distal vibratory sense.

On November 7, 2005, defendant returned to Dr. Brawley for a follow-up evaluation to determine if the signs of dementia were attributable to the use of prescription medications.   She noted that at the time of this evaluation defendant had "reportedly" not taken any prescription medications which may affect his cognition for "approximately three weeks."  The tests showed some mild improvement in certain areas and

some decline in others, leading Dr. Brawley to conclude that the current results continue to be "consistent with a diagnosis of dementia." She added that his depression would not account for the "entirety of his deficits."

On November 8 and 9, 2005, Phillip J. Resnick, M.D.,[5] performed a psychiatric evaluation of defendant. He interviewed defendant and his wife, daughter, attorney, and accountant, and he observed defendant interacting with his attorney. He reviewed various medical and legal reports, including Dr. Griesemer's report, the first report from Dr. Brawley, medical records from Dr. Demicco, and a case outline prepared by defendant's attorney. Defendant reported that he "first became aware of a problem with his memory 'a couple of years ago'" and that he began taking Valium after December 2002 when the "raid" occurred to collect evidence that ultimately led to his indictment. He described his mood to Dr. Resnick as "scared," and when asked why, he responded that he was "ruined if convicted or not."

On the basis of these interviews and his review of the medical history and reports, Dr. Resnick reached a diagnosis "dementia, not otherwise specified" and "Major Depressive Disorder, chronic, severe, without

---

[5]Dr. Resnick is currently a Professor of Psychiatry and Director of the Division of Forensic Psychiatry at Case Western Reserve University School of Medicine.

psychotic features." He reported that defendant seemed able to understand the nature and consequences of the proceedings against him, but he had serious doubts about defendant's ability to assist properly in his defense. Dr. Resnick opined that defendant could not adequately assist his counsel in his defense if the trial schedule exceeded seven hours a day and regular breaks were not taken.[6] Dr. Resnick delayed making a final judgment on defendant's competency until such time as he could conduct additional interviews and review Dr. Brawley's second report.

On November 28, 2005, Dr. Resnick submitted a second report, after another day of interviews with defendant and others, and after reviewing the second report from Dr. Brawley.[7] Dr. Resnick reported that defendant was not substantially changed in his conduct, appearance, or mood from the

---

[6]Dr. Resnick recommended that the trial day not last past 3:30 in the afternoon, as he believed defendant's ability to participate would become impaired as the day lengthened.

[7]In total, Dr. Resnick spent three days interacting with defendant and his family and attorney. He spent a total of five hours and fifty minutes alone interviewing defendant, thirty minutes interviewing defendant with his attorney in the room, and a total time of four hours and fifty-five minutes observing the interaction between defendant and his attorney. He spent a total of three hours interviewing Mrs. Bradley, one hour and twenty-five minutes interviewing Mr. and Mrs. Bradley together, and three hours and twenty minutes interviewing defendant's attorney. Finally, he spent one hour and five minutes with defendant's daughter and one hour and fifteen minutes with defendant's accountant.

previous examination. He noted defendant shows "rigidity" in his thinking. During his observation of defendant interacting with his attorney, Dr. Resnick reported that in a mock cross-examination, defendant violated the instructions of his attorney and encountered difficulty responding to specific questions without offering extraneous material. He also remarked that defendant was argumentative and emotionally over-reactive.

Dr. Resnick added a third diagnosis of Anxiety Disorder. He concluded that although defendant understands the nature and consequences of the proceedings against him, he is unable to properly assist in his defense due to his dementia and severe depression.

At the Court's direction, defendant spent December 6, 2005 through December 23, 2005 at the Federal Medical Center in Butner, North Carolina undergoing an evaluation by the medical staff. The Butner report[8] notes that upon admission defendant was "articulate" and, in relating his history, provided "extensive detail in most instances, though he reported difficulty with on demand recall of some details." The report describes

---

[8]This report was prepared and signed by Edward E. Landis, Ph.D., ABPP, the Director of Psychology Training at the Mental Health Department of the Butner facility; Eugene V. Gourley III, Ph.D., Staff Neuropsychologist; and Ralph Newman, M.D., Staff Psychiatrist.

defendant as "well aware of the complexity of the charges against him" and of the "significance of the current evaluation in the process of his case."[9] The report notes that defendant "spoke freely and often elaborated on his ideas" in discussing different aspects of his trial and was "redirectable and tolerated being interrupted as needed."   Defendant was described to "function better than had been described in the reports of Drs. Brawley and Resnick."

When defendant was interviewed at Butner concerning his memory problems, he mentioned that his memory gets worse "under pressure" and said that he is "under a lot of pressure — lots of legal problems — the prosecutor thinks I'm an evil man."  Defendant also admitted at Butner that he "has been very depressed since his legal problems began" but said he did not realize he was depressed until Dr. Brawley diagnosed him as such.

At Butner, defendant was once again subjected to a multitude of neuropsychological examinations.  He showed "substantial improvement" on intellectual testing over his May 2005 tests, and he demonstrated

---

[9]The report quotes defendant as stating, "I told [Dr.] Gourley that you guys are my only hope.  If you guys find me not competent I won't have to go to trial — it's over."

"significant improvements" in functioning on intellectual tasks. The report maintains that "the current results strongly suggest that major depression and/or the effects of psychoactive drugs were primary factors in diminished cognitive functioning rather than a progressive dementia." The report describes defendant's performance on measures of memory and other neurocognitive skills as suggestive that mood and motivational factors contribute to variable performance.[10]

The Butner report indicates that defendant showed impairments in some areas, particularly in the area of recognition memory. Defendant was also given the Victoria Symptom Validity Test, a memory test designed to assess effort and motivation. This test creates an impression that some items are "easy" while others are "difficult" when, in reality, the difference in difficulty is small. Defendant answered all of the "easy" items correctly, and he answered most "difficult" questions incorrectly and below chance levels. The report notes that "[t]he chance he obtained his score by chance alone was less than 10% suggesting that he likely was intentionally providing incorrect answers." Further, the report notes defendant's

---

[10]The report also notes that direct comparison is qualified by the fact that different memory tests were used by Dr. Brawley and in the Butner evaluations.

performance "strongly suggests" that he "was making a conscious effort to exaggerate his memory problems on this task."

Regarding his competency to stand trial, the Butner report states that defendant's current scores on intelligence testing exceed 86% of same-aged peers, and even with depression-related difficulties, "he is better situated to confront the challenges of trial than the majority of criminal defendants." Regarding questions about his ability to recall and provide accurate information to defense counsel, the report notes that during his stay at Butner defendant commented that "It's God's gift that I can put the bad things out of my mind. I take the conscious and put it into the subconscious."[11] The report also notes that defendant did not appear to "confabulate" or confuse information extensively about his case. In fact, he appeared "eager to tell his own, exculpatory version of events, consistent with his assertion that he has done nothing wrong." The report finds that defendant has "sufficient ability to attend to the trial process and manage his behavior accordingly."

---

[11]The report notes that defendant said this in relation to memory deficits around his father's death, but defendant understands this to be a part of his personality.

The Butner report concludes that defendant suffers from Major Depressive Disorder and Anxiety Disorder Not Otherwise Specified but that these conditions do not render him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.  The report recommends providing regular breaks for defendant and limiting the daily schedule of proceedings requiring his participation, in accord with Dr. Resnick's recommendations.

## II.   ANALYSIS

Upon a motion to determine the competency of a defendant to stand trial, "[t]he court shall grant the motion . . . if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241.  The Supreme Court has repeatedly recognized that "the criminal trial of an incompetent defendant violates due process."  Cooper v. Oklahoma, 517

U.S. 348, 354 (1996); <u>Medina v. California</u>, 505 U.S. 437, 453 (1992); <u>Drope</u>

<u>v. Missouri</u>, 420 U.S. 162, 171-72 (1975); <u>Pate v. Robinson</u>, 383 U.S. 375,

378 (1966). Instead, a defendant must have "sufficient present ability to

consult with his lawyer with a reasonable degree of rational understanding

of the proceedings against him." <u>Dusky v. United States</u>, 362 U.S. 402, 402

(1960) (per curiam).

Once the issue of competency is raised, the burden of proof falls on the

government to show that a defendant is competent. <u>United States v.</u>

<u>Makris</u>, 535 F.2d 899, 906 (5th Cir. 1976); <u>United States v. Marbley</u>, 410

F.2d 294, 295 (5th Cir. 1969); <u>accord</u> <u>United States v. Teague</u>, 956 F.2d

1427, 1432 (7th Cir. 1992); <u>Brown v. Warden</u>, 682 F.2d 348, 349 (2d Cir.

1982); <u>United States v. Hollis</u>, 569 F.2d 199, 205 (3d Cir. 1977); <u>Conner v.</u>

<u>Wingo</u>, 429 F.2d 630, 639 (6th Cir. 1970); <u>United States v. Mason</u>, 935 F.

Supp. 745, 759 (W.D.N.C. 1996).[12]   Section 4241(d) requires the

---

[12]The Supreme Court has stated in dicta, however, that "Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence." <u>Cooper v. Oklahoma</u>, 517 U.S. 348, 361 (1996); <u>accord</u> <u>United States v. Smith</u>, 521 F.2d 374, 377 (10th Cir. 1975). The <u>Cooper</u> court also recognized that the burden of proof only would affect the outcome of a competency determination "in a narrow class of cases where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent." <u>Cooper</u>, 517 U.S. at 355. No such equipoise of evidence is present here; thus, the outcome of the instant competency determination does not turn on the burden of proof issue.

determination of competency to be made by a preponderance of the evidence.

Under the first prong of the analysis under 18 U.S.C. § 4241, the Court must determine whether defendant has the mental capacity "to understand the nature and consequences of the proceedings against him." All experts concur that defendant understands the nature and consequences of the charges leveled against him.  The Court must therefore turn to the second prong of the analysis under § 4241 and determine whether defendant can consult with his lawyer with a reasonable degree of understanding in order to assist in the defense of his charges.  On this issue, the reports differ.

The Court gives greater weight to the report of the Federal Medical Center for several reasons.  First, the team of experts involved in preparing the Butner report had the opportunity to evaluate defendant continuously over the course of a seventeen-day period.  The other reports were products of a much shorter evaluation period.  In the case of the two reports of Dr. Brawley and the report of Dr. Griesemer, defendant was only seen by the evaluators for some portion of one day.  Dr. Resnick spent more time with

14

defendant and was able to observe him interact with family members and his attorney, but his total evaluation time only occurred over only a three-day period.

Additionally, the Butner report is the most recent clinical opinion available. This is particularly significant in this case, where there is reason to believe that some of the deficits noted during defendant's evaluations were the result of the narcotics and psychotropic medications which he was taking. As early as 2004, defendant's personal doctor observed that some of his memory loss could be attributed to the medications he had been taking. Dr. Brawley noted in her second report that at the time of that evaluation defendant had reportedly not been taking any prescription medication which may have affected cognition by sedating or slowing effects. The Butner report recognizes this but points out that defendant had apparently only stopped the medications for about two or three weeks prior to the evaluation and that he may have continued to show effects as withdrawal symptoms. Further, the Butner report adds that defendant was "likely experiencing depression, anxiety, and pain that were not treated,

any of which may have served to interfere with optimal performance on prior testing."

The Butner report indicates that "discontinuation of Valium may not lead to withdrawal symptoms for more than a week, peak during the second week, and decrease markedly during the third or fourth week, suggesting that Mr. Bradley may have been experiencing withdrawal symptoms at the time of the November evaluations, while these complications were less likely during the current evaluation."  The Butner report further states that during his evaluation at the FMC defendant exhibited "substantial improvement in functioning despite continuing to show some irritability and low frustration tolerance associated with depression."  Thus, the Court believes that this evaluation of defendant represents a more accurate assessment of his mental capacity, with a much smaller chance the results were tainted by lingering effects of defendant's previous medications.

Defendant also made several comments to evaluators at the FMC that indicated he understood the importance of this competency evaluation in his effort to avoid a trial.  As mentioned above, defendant said that "I told [Dr.] Gourley that you guys are my only hope.  If you guys find me not

competent I won't have to go to trial — it's over."  Defendant is also noted to have said that raising questions regarding his competence was "against [his] grain" and "a coward's way out."  These comments demonstrate a sense of desperation harbored by defendant and a belief that if he is to avoid an unfavorable result, he must avoid trial.

Although defendant's experts diagnosed him as suffering from a progressive dementia, his evaluation at FMC demonstrated "substantial improvement in intellectual and many areas of memory functioning relative to prior evaluations, effectively ruling out a progressive dementia."  The report continues to say that "his functional limitations should be attributed to other causes some of which may be more amendable to treatment, principally depression, chronic use of prescription pain medications and anxiolytics, and the adverse effects of the extreme stress of being a criminal defendant."  The Court credits this assessment and finds that defendant is not suffering from a progressive dementia that renders him unable to assist his attorney in the defense of the charges.  The Court, therefore,  agrees with the Butner report that defendant is competent to stand trial.

Finally, evidence that defendant may have intentionally exaggerated his memory deficits on the evaluations at FMC provide additional support for the theory that he is competent to stand trial.  The Butner report indicates that defendant showed patterns consistent with exaggeration on several tests, including the Victoria Symptom Validity Test, MMPI-2, and the Neuropsychology Impairment Scale.  The report suggests that these results  indicate that defendant "may have realized his performance had improved and attempted to exaggerate some memory deficits."

Ultimately, the Court is persuaded by the Butner report that defendant is competent to stand trial. While all reports note that defendant has episodes of forgetting his keys, forgetting to shave, or finding himself at the grocery store and forgetting what he is there to purchase, these minor (and not uncommon) memory lapses do not foreclose his ability to interact with his attorney and plan his defense.  Further, it appears that the longer defendant is off the medications that were affecting his cognition, the more he should be able to assist in his defense.

## III.  CONCLUSION

The Court has thoroughly reviewed the reports that have been submitted on the issue of defendant's competence.  The Court concludes that defendant understands the substance and potential consequences of the charges pending against him.  The Court further concludes that defendant retains the ability to properly assist in his defense.  The Court can make any necessary accommodations in order to ensure defendant's full participation in the trial, including granting morning and afternoon breaks and making adjustments to the daily trial schedule.  For these reasons, the Court recommends that defendant be declared competent to stand trial.

**SO REPORTED AND RECOMMENDED** this 24th day of January, 2006.

**UNITED STATES MAGISTRATE JUDGE**
**SOUTHERN DISTRICT OF GEORGIA**